**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
COOK INLET TRIBAL COUNCIL,      )
                                )
          Plaintiff,            )
                                )
     v.                         )     Case No. 14-cv-1835 (EGS)
                                )
CHRISTOPHER MANDREGAN, JR.,     )
_et. al._,                      )
                                )
          Defendants.           )
_____)

## MEMORANDUM OPINION

### I. Introduction

Over twenty-five years ago, the Cook Inlet Tribal Council ("CITC") and the Indian Health Service ("IHS") entered into a self-determination contract pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"). Under this contract, CITC has operated substance abuse programs serving Alaskan Native patients, while IHS provides federal funding to CITC, allowing CITC to administer federal programs and services that IHS would have otherwise provided. In 2014, CITC proposed a contract amendment for additional "contract support costs" funding to account for increased facility support costs, among other costs. IHS declined CITC's proposed amendment in part, stating that CITC receives payment for facility support costs as part of its annual "Secretarial" funding. CITC now

1

appeals IHS' declination decision, bringing suit against Christopher Mandregan, Jr., Alaska Area Director of IHS; Alex Azar,[1] Secretary of the Department of Health and Human Services ("HHS"); and the United States of America. At issue is whether the ISDEAA clearly requires that CITC's facility support costs be funded exclusively from the Secretarial amount, or whether CITC's facility support costs may also be funded as contract support costs.

Pending before the Court are the parties' cross-motions for summary judgment. Having carefully reviewed the motions and the entire record herein, the Court concludes that CITC's interpretation of the ISDEAA's ambiguous funding provision is reasonable. Therefore, the Court **GRANTS IN PART** CITC's motion for summary judgment and **DENIES** the defendants' cross-motion for summary judgment. However, rather than "immediately" compel IHS to approve and fund CITC's proposed contract amendment, the Court **VACATES** IHS' declination decision and **REMANDS** the matter to IHS for a determination consistent with this Memorandum Opinion.

## II. Background

This case arises out of a dispute regarding the ISDEAA's funding provisions. The ISDEAA authorizes the government and

---

[1] Secretary Azar has been substituted pursuant to Federal Rule of Civil Procedure 25(d).

Indian tribes to enter into self-determination contracts, pursuant to which tribes receive federal funding to provide certain services that a federal agency would normally provide. *See* 25 U.S.C. §§ 5301, *et. seq.*[2] The ISDEAA was designed—in recognition of the country's "obligation" "to respond to the strong expression of the Indian people for self-determination"— to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." *Id.* § 5302(a), (b). Consistent with these aims, the ISDEAA "direct[s]" the government to enter into and negotiate self-determination contracts with Indian tribes upon tribal request. *Id.* § 5321(a)(1). "Under a self-determination contract, the federal government supplies funding to a tribal organization, allowing [the tribe] to plan, conduct and administer a program or service that the federal government otherwise would have provided directly." *Rancheria v. Hargan*, 296 F. Supp. 3d 256, 260 (D.D.C. 2017) (quoting *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995)(quotation marks omitted).

---

[2] The parties cite to 25 U.S.C. §§ 450, *et. seq.*, when referring to the ISDEAA. The ISDEAA has since been recodified. As such, all citations in this Memorandum Opinion reflect the statute's current codification.

CITC challenges IHS' decision to decline CITC's proposed contract amendment in part ("declination decision"). *See* Compl., ECF No. 1. IHS is an agency within HHS that provides primary health care for American Indians and Alaskan Natives throughout the United States. Defs.' MSJ, ECF No. 15 at 8.[3] IHS provides health care by several means, including directly through its own facilities or by contracting with tribes and tribal organizations pursuant to the ISDEAA. *Id.* at 8-9.

CITC is a "private, non-profit corporation that delivers social, education, employment, training, alcohol treatment, child care, housing assistance, energy assistance and planning services to the Alaska Native people of the Cook Inlet Region." A.R.,[4] ECF No. 17-1 at 3. The services it provides to Native Alaskans are funded by the federal government and the state of Alaska. *Id.* CITC operates under the authority of its Board of Directors, which is made up of representatives from eight federally-recognized tribes: (1) the Chickaloon Village

---

[3] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

[4] Pending before the Court are the defendants' two motions to enlarge and/or supplement the administrative record. *See* ECF Nos. 17, 20. CITC did not oppose the motions and in fact, attached some of the supplemental materials to its motion for summary judgment. *See* ECF No. 13, Exs. A-C. The Court therefore **GRANTS** the defendants' motions to supplement the record. The Court considered all of the material on the docket in reaching its decision.

Traditional Council; (2) the Native Village of Eklutna; (3) the
Kenaitze Indian Tribe; (4) the Knik Tribal Council; (5) the
Ninilchik Traditional Council; (6) the Salamatof Tribal Council;
(7) the Seldovia Village Tribe; (8) and the Native Village of
Tyonek. *See id.*; Pl.'s Stmt., ECF No. 13-2 ¶ 1.

CITC has been a "tribal contractor" under the ISDEAA since
1992, Defs.' Stmt., ECF No. 15-1 ¶¶ 1, 2, when it submitted a
proposal to IHS to enter into a self-determination contract to
provide residential treatment and recovery services at the
Alaska Native Alcohol Recovery Center, *see* A.R., ECF No. 17-2;
Pl.'s Stmt., ECF No. 13-2 ¶ 2. IHS accepted the proposal. Pl.'s
Stmt., ECF No. 13-2 ¶ 3. In the first year of the self-
determination contract, CITC was provided approximately $150,000
in Secretarial funding, which included $11,838.50 for facility-
related costs. *Id.* ¶¶ 3, 4; *see also* A.R., ECF No. 17-2. Since
then, CITC's programs have "expanded substantially . . . with
most funding coming from increases in congressional
appropriations." Pl.'s Stmt., ECF No. 13-2 ¶ 5. Accordingly, its
funding increased from about $150,000 in 1992 to approximately
$2,000,000 in 2014, including the $11,838.50 IHS has paid
annually for facility support costs since 1992. *See* A.R., ECF
No. 11-1 at 2 ($1,943,226 as of April 2014); Pl.'s Stmt, ECF No.
13-2 ¶ 6 ($2,518,559).

By 2013, CITC's facility support costs grew to $479,040, including the $11,838.50 IHS has paid annually since 1992. Pl.'s Stmt, ECF No. 13-2 ¶ 8. On April 11, 2014, CITC requested to amend of its 2014 self-determination contract to add $479,040 in "direct contract support costs associated with facility support." A.R., ECF No. 17-3. In its proposal, CITC argued that its request should be approved because facility support funds are "reasonable costs for activities which must be carried on by CITC as a contractor" pursuant to the ISDEAA. *Id.* (citing 25 U.S.C. § 5325(a)(2)). On July 7, 2014, IHS denied CITC's proposal based on one of the five declination options permissible under the ISDEAA: the amount CITC requested was "in excess of the applicable funding level for the contract." A.R., ECF No. 11-1 at 2-3 (citing 25 U.S.C. § 5321(a)(2)(D)).[5] In its declination letter, IHS explained that facility support costs were already included as part of CITC's "program base," or the "Secretarial amount." *Id.* The Secretarial amount is the funding that "IHS would have spent for costs associated with its programs" had it run the program itself. *Id.* (citing 25 U.S.C. § 5325(a)(1)). According to IHS, paying the requested $479,040 in "direct contract support costs" would cause it to pay CITC for

_____

[5] IHS approved other costs as contract support costs, including training and certification costs, unemployment insurance, and workers' compensation insurance and costs. Pl.'s Stmt., ECF No. 13-2 ¶ 10.

facility support costs twice, in violation of the ISDEAA. *See id.* (citing 25 U.S.C. § 5325(a)(3)(A) (contract support costs funding "shall not duplicate any funding" otherwise provided)).

CITC appealed this declination decision by filing a complaint on October 31, 2014. Compl., ECF No. 1. The parties filed cross-motions for summary judgment in 2015, which the Court denied without prejudice while the parties engaged in settlement negotiations. *See* Jan. 4, 2016 Minute Order. After the negotiations failed, the Court granted the parties' motions to reinstate the cross-motions for summary judgment. *See* June 8, 2016 Minute Order.

## III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). CITC's claim arises under the ISDEAA, not the Administrative Procedure Act. As such, the Court's review of IHS' declination decision is *de novo*. *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 542 (D.D.C. 2014); *see also* Defs.' MSJ, ECF No. 15 (not disputing that the Court's review is *de novo*).

When a tribe appeals a government agency's declination decision under the ISDEAA, as here, the burden of proof rests with the government: "the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 5321(e)(1). Therefore, IHS must "clearly demonstrate" and make a "specific finding" that there exists one of five permissible grounds to decline. *Id.* § 5321(a)(2). In other words, the government "must demonstrate that its reading is clearly required by the statutory language." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012)(quoting 25 U.S.C. § 5329). IHS must therefore *clearly demonstrate* that CITC's contract proposal for additional facility support costs was in excess of the self-determination contract's applicable funding level. 25 U.S.C. § 5321(a)(2). To do so, IHS must establish that facility support costs were included in CITC's Secretarial amount and to pay them again would violate the ISDEAA's prohibition against duplicative funding. *See id.*; *id.* § 5325(a)(3)(A); *see also* A.R., ECF No. 11-1 at 2-3.

Additionally, the ISDEAA and the self-determination contracts formed thereunder "shall be liberally construed for the benefit of the [tribal] Contractor." *Ramah Navajo*, 567 U.S. at 194 (quoting 25 U.S.C. § 5329). This canon of construction has been codified in the ISDEAA, *see* 25 U.S.C. § 5329, and is

memorialized in the self-determination contract between IHS and CITC, *see* A.R., ECF No. 11-1 at 14 § (a)(2) ("Each provision of the Indian Self-Determination and Education Assistance Act and each provision of this contract shall be liberally construed for the benefit of the Contractor . . . ."); *see also* 25 U.S.C. § 5329(c) (model agreement codifying this provision); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (when cases involve American Indians, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").

This canon displaces the deference a court would otherwise give an agency's interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) in a challenge brought pursuant to the Administrative Procedure Act. *See Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (Because "the governing canon of construction" requires liberal construction in favor of tribes, "*Chevron* deference is not applicable in this case"). Therefore, when interpreting a statute, a court must first determine whether the statutory text is plain and unambiguous. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). If so, the court "must apply the statute according to its terms." *Id.* If, on the other hand, the court determines the statute to be ambiguous, the court need not give controlling weight to an agency's reasonable interpretation of that statute,

as it normally would under *Chevron*. *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988)("[T]he standard principles of statutory construction do not have their usual force in cases involving Indian law."). Instead, the court is to give IHS' views "consideration," but not deference. *Cobell*, 240 F.3d at 1101; *see also Rancheria*, 296 F. Supp. 3d at 265-67 (D.D.C. 2017)(summarizing "statutory interpretation and *Chevron* deference in Indian law"); *Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 232 (D.D.C. 2014) ("[T]he canon of construction in favor of Indian tribes can trump the deference to agencies' interpretations courts ordinarily give under *Chevron* and its progeny . . . ."). Because "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," the Court must construe any ambiguity or inconsistency in the ISDEAA or the self-determination contract in CITC's favor. *Muscogee*, 851 F.2d at 1444-45 (quoting *Blackfeet Tribe*, 471 U.S. at 766).

**IV. Analysis**

IHS denied CITC's contract proposal because the "amount of funds proposed . . . is in excess of the applicable funding level for the contract." A.R., ECF No. 11-1 at 3. According to IHS, CITC is not entitled to the requested facility support funding because that funding has been included in CITC's "Secretarial amount." *See id.* The Secretarial amount is "the

10

amount that the IHS would have spent for costs associated with its programs" under the ISDEAA. *Id.* Because the Secretarial amount is capped at the amount IHS would have spent, IHS may "decline any proposal seeking funds in excess of that amount." *Maniilaq Ass'n*, 170 F. Supp. 3d at 249 (citations omitted). Although it has received $11,838.50 annually in facility support costs since 1992, CITC argues that its increasing facility support costs have not been funded in the Secretarial amount. *See generally* Pl.'s MSJ, ECF No. 13. Therefore, CITC contends that such costs must be provided as eligible "contract support costs." *Id.* IHS responds that CITC's Secretarial amount has steadily increased to almost $2 million in 2014 to "account for inflation and rising costs of operating" Indian programs. Defs.' MSJ, ECF No. 15 at 6. It contends that this amount includes funding for increased facility support costs. *Id.* CITC replies that IHS has provided no evidence to support that it provided increased facility support costs beyond the $11,838.50 paid annually since 1992; therefore, it argues that IHS failed to meet its burden under the ISDEAA. Pl.'s Reply, ECF No. 18 at 16.

At issue, then, is whether the ISDEAA clearly requires that CITC's facility support costs be funded exclusively from the Secretarial amount, or whether CITC's facility support costs may also be funded as contract support costs. *See generally* Pl.'s MSJ, ECF No. 13; Defs.' MSJ, ECF No. 15. In reaching its

decision, the Court first discusses the ISDEAA's statutory scheme and the two types of funding provided thereunder. The Court then evaluates whether the statute speaks clearly on the precise question. Concluding that it does not, the Court finds CITC's interpretation of the ambiguous statutory provision to be reasonable, particularly in light of IHS' contradictory guidance, which contemplates that facility support costs may be paid as contract support costs in certain circumstances. Similarly, the Court finds that IHS' interpretation is not compelled by the ISDEAA and may in fact be contradicted by its own regulations and guidance.

**A. The Indian Self-Determination and Education Assistance Act**

Congress enacted the ISDEAA in 1975 to codify the federal government's "obligation" to "respond to the strong expression of the Indian people for self-determination" and to achieve "maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities." 25 U.S.C. § 5302(a). To that end, the Act mandates that IHS *must* "upon the request of any Indian tribe . . . enter into a self-determination contract . . . to plan, conduct, and administer" health, education, economic, and social programs that the Secretary otherwise would have administered. *Id.* § 5321(a); *see also Salazar v. Ramah Navajo Chapter*, 567

U.S. 182, 186 (2012). Once the self-determination contract has been executed, the government must pay the tribe's costs to run the program that it would have otherwise administered. *See* 25 U.S.C. § 5325. The ISDEAA provides for two types of funding: (1) "Secretarial" amount funding, pursuant to § 5325(a)(1); and (2) "contract support costs" funding, pursuant to § 5325(a)(2), (3).

The Secretarial amount is "the amount that the agency would have spent 'for the operation of the program' had the agency itself managed the program." *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 634 (2005)(quoting 25 U.S.C. § 5325(a)(1)); *see also Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 629 F.3d 1296, 1298-99 (Fed. Cir. 2010) ("The [S]ecretarial amount is the amount the Secretary would have expended had the government itself run the program."), *vacated on other grounds*, 567 U.S. 930 (2012). The Secretarial amount "shall not be less than [the amount] the appropriate Secretary would have otherwise provided for the operation of the programs . . . covered by the contract, without regard to the organizational level" within the relevant agency "at which the program . . . , including supportive administrative functions that are otherwise contractible, is operated." 25 U.S.C. § 5325(a)(1). The statute does not provide examples of types of costs that are included in the Secretarial amount.

As originally enacted, the ISDEAA only required the government to provide Secretarial funding, equivalent to the amount that the Secretary would have otherwise provided. *Ramah Navajo*, 567 U.S. at 186 (discussing § 106(h), 88 Stat. 2211). However, "it soon became apparent that this [S]ecretarial amount failed to account for the full costs to tribes of providing services." *Id.* For example, the Secretarial amount "does not include the additional indirect costs that the tribes incur in their operation of the programs, which the Secretary would not have directly incurred (i.e., the cost of the administrative resources that the Secretary could draw from other government agencies)." *Arctic Slope*, 629 F.3d at 1299. Therefore, in 1988, "because of 'concern with Government's past failure to adequately reimburse tribes' indirect administrative costs,' Congress amended [the ISDEAA] to require the Secretary to contract to pay the full amount of contract support costs related to each self-determination contract." *Ramah Navajo*, 567 U.S. at 186 (quoting *Cherokee Nation*, 543 U.S. at 639) (quotations to the statute omitted).

Under the ISDEAA, contract support costs "shall be added" to the Secretarial amount. 25 U.S.C. § 5325(a)(2). Contract support costs are defined as:

> an amount for the reasonable costs for
> activities which must be carried on by a
> tribal organization as contractor to ensure

> compliance with the terms of the contract and
> prudent management, but which—
>
> (A) normally are not carried on by the
> respective Secretary in his direct operation
> of the program; or
>
> (B) are provided by the Secretary in
> support of the contracted program from
> resources other than those under the contract.

*Id.* These costs "include overhead administrative costs, as well

as expenses such as federally mandated audits and liability

insurance." *Ramah Navajo*, 567 U.S. at 186, n.1. Unlike the

Secretarial amount provision, the statute provides further

insight into the type of costs that may be eligible for contract

support costs funding:

> The contract support costs that are eligible
> costs for the purposes of receiving funding
> under this chapter shall include costs of
> reimbursing each tribal contractor for
> reasonable and allowable costs of—
>
> (i) direct program expenses for the
> operation of the Federal program that is the
> subject of the contract, and
>
> (ii) any additional administrative or
> other expense related to the overhead incurred
> by the tribal contractor in connection with
> the operation of the Federal program,
> function, service, or activity pursuant to the
> contract,
>
> except that such funding shall not
> duplicate any funding provided under
> subsection (a)(1) of this section [the
> Secretarial amount].

25 U.S.C. § 5325(a)(3)(A); *see also Cherokee Nation*, 543 U.S. at

635 (describing contract support costs as defined in the

statute).

Whether a cost or "activity" is included in the Secretarial amount or is eligible as a contract support cost is significant because the ISDEAA obligates IHS to fully fund contract support costs. *See Ramah Navajo*, 567 U.S. at 193-94 (holding that the government "cannot back out of its contractual promise to pay each Tribe's full contract support costs"). On the other hand, IHS is only obligated to provide Secretarial funding in an amount not less than the Secretary would have otherwise provided. 25 U.S.C. § 5325(a)(1). Thus, the amount of Secretarial funding provided is committed to agency discretion. Defs.' MSJ, ECF No. 15 at 13 (citing *Quechan Tribe of the Ft. Yuma Indian Res. v. United States*, Case No. 11-16334, slip op. at 3 (9th Cir. Apr. 1, 2015)).

CITC requested $479,040 in contract support costs funding for its facility support costs in a proposal to amend the 2014 self-determination contract. A tribe may propose to amend a self-determination contract by, for example, amending a funding agreement. *See* 25 U.S.C. § 5321(a)(2). The government "shall" approve a proposal to amend a self-determination contract "unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates" that one of five declination criteria or conditions have been met. *Id.*; *see also* 25 C.F.R. § 900.29 (IHS Regulation: "What is the Secretary required to do if the

Secretary decides to decline all or a portion of a proposal?"). If an agency declines the proposal, the tribe may initiate an action in a federal district court. 25 U.S.C. § 5321(b)(3). If the district court concludes that the agency has not clearly demonstrated a valid ground to decline, the court may order appropriate relief including "money damages, injunctive relief . . . , mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty . . . (including immediate injunctive relief to reverse a declination finding . . . or to compel the Secretary to award and fund an approved self-determination contract)." *Id.* § 5331(a).

## B. Section 5325 of the ISDEAA is Ambiguous

As stated by IHS, "this case raises a novel issue about what activities, and the associated costs, are eligible for [contract support costs] funding under the ISDEAA." Defs.' MSJ, ECF No. 15 at 13. The Court must determine whether the ISDEAA clearly requires that CITC's facility support costs be funded exclusively from the Secretarial amount, or whether they may also be funded as contract support costs.

IHS argues that the "plain language" of the ISDEAA "authorizes [contract support costs] funding only for activities normally not carried on by the Secretary . . . but that tribes must carry on to ensure compliance with the terms of the contract and prudent management." *Id.* at 25. Therefore, IHS

argues that facility support costs are not eligible for contract support costs funding because "facility activities, and the corresponding costs, are [a program, function, service, or activity] that the IHS would normally carry out and incur if it was managing a facility." *Id.* at 5. Therefore, because IHS would "normally" pay for facility support costs, the ISDEAA "makes clear" that those costs must constitute Secretarial funding. *Id.* at 20; *see id.* 7, 15-16. According to IHS, CITC is impermissibly attempting to supplement its Secretarial amount by "recharacterizing" facility support costs as contract support costs. *Id.* at 20.

CITC responds that facility support costs are eligible to be funded both as Secretarial funding, as a portion of them have been since 1992, *and* as contract support costs because they are "reasonable and allowable costs" required for the operation of the program. Pl.'s MSJ, ECF No. 13-1 at 1 (quoting 25 U.S.C. § 5325(a)(3)(A)). Because a tribal contractor "must ensure it has adequate space to provide the services required by the contract," CITC argues that facility support costs are necessary "to ensure compliance with the terms of the [self-determination] contract and prudent management." *Id.* at 12 (quoting 25 U.S.C. § 5325(a)(2)). CITC disputes that it is attempting to impermissibly expand its Secretarial funding. Pl.'s Reply, ECF No. 18 at 14-15. Instead, it contends that its facility support

cost funding has never increased from the original $11,838.50 provided in the Secretarial amount since 1992, despite its expanded treatment programs. *Id.* at 16-19; Pl.'s MSJ, ECF No. 13-1 at 19.

First, the Court must determine whether the provision at issue is ambiguous. If the statute is ambiguous, the Court must construe the ambiguities in CITC's favor. *See Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (holding that the tribal cannon must yield when the tribe's interpretation would "conflict with the intent embodied in the statute Congress wrote"). "Generally, a statute's text is only ambiguous if, after 'employing traditional tools of statutory construction,' a court determines that Congress did not have a precise intention on the question at issue." *Al-Bihani v. Obama*, 619 F.3d 1, 7 (D.C. Cir. 2010) (quoting *Chevron*, 467 U.S. at 843 n. 9). The Court must therefore ask whether "Congress has directly spoken to the precise question at issue"—whether facility support costs must be exclusively funded from the Secretarial amount—such that its intent is "clear." *Chevron*, 467 U.S. at 842-43.

The ISDEAA does not clearly answer whether facility support costs may be provided only in the Secretarial amount, pursuant to 25 U.S.C. § 5325(a)(1), or whether they may also be eligible as contract support costs, pursuant to subsections 5325(a)(2), (3). The statute states that the Secretarial amount includes

funding that the "appropriate Secretary would have otherwise
provided for the operation of the programs or portions thereof
for the period covered by the contract." 25 U.S.C. § 5325(a)(1).
The statute does not provide examples of activities included in
the Secretarial amount. *See id.* Conversely, the statue states
that contract support costs are the "reasonable costs for
activities" that are "normally not carried on by the respective
Secretary in his direct operation of the program,"[6] yet "must be
carried on by a tribal organization as contractor to ensure
compliance . . . and prudent management." *Id.* § 5325(a)(2).

The question, then, is what activities are "normally not
carried on" by an agency in operating a program. 25 U.S.C. §
5325(a)(2)(A). Both the statute, *see id.*, and IHS regulations,
*see* 25 C.F.R. §§ 900.1, *et. seq.,* are silent on this question.
Furthermore, IHS neither suggests a definition of "normally,"
nor provides examples of what "normal" costs would be. *See
generally* Defs.' MSJ, ECF No. 15.

The "dictionary definition" of "normal" and the "everyday
meanings of the term and phrase [as used in the statute]" do not
provide clarity, especially given the complexities of federal

---

[6] Contract support costs may also include funds that "are
provided by the Secretary in support of the contracted program
from resources other than those under the contract." 25 U.S.C. §
5325(a)(2)(B). Neither party argues that CITC's requested
facility support costs meet this definition. *See generally* Pl.s'
MSJ, ECF No. 13-1; Defs.' MSJ, ECF No. 15.

program funding. *See Howmet Corp. v. Envt'l. Prot. Agency*, 614
F.3d 544, 550 (D.C. Cir. 2010)(looking to the dictionary
definition and everyday meaning of "purpose" to determine that
the term, as used in the statute, was ambiguous). For example,
"normal" means "according to a regular pattern," "an established
rule," or a "standard or norm." *See* "Normal," Black's Law
Dictionary (10th ed. 2014). To determine if a cost is "normally"
carried by an agency, *see* 25 U.S.C. § 5325(a), the Court must
have some indication or knowledge about what is "standard,"
"typical," or "established" agency practice with regard to
program spending. *See* "Normal," Black's Law Dictionary (10th ed.
2014). The Court has been provided with no such information
about typical agency practice. Without more, the intent of
Congress is not clear; the statute is "silent or ambiguous with
respect to the specific issue." *Chevron*, 467 U.S. at 843. And
reading the statute "as a whole" does not reveal a "clear
congressional intent regarding the relevant question." *Nat'l
Envt'l. Dec. Ass'ns Clear Air Project v. Envt'l. Prot. Agency*,
891 F.3d 1041, 1048 (D.C. Cir. 2018)(quotations omitted).

IHS argues that the provision is unambiguous because
facility support costs are "normally" incurred by an agency in
running a treatment program. *See, e.g.,* Defs.' MSJ, ECF No. 15
at 19-20, 26; Defs.' Reply, ECF No. 21 at 2-5. But costs
"normally" incurred in running a federal program is not clear or

obvious. For example, in responding to CITC's proposed contract amendment, IHS stated that it "accepted all of CITC's proposed direct [contract support costs], with the exception of the . . . facility costs." Defs.' MSJ, ECF No. 15 at 5 (citing A.R., ECF No. 11-1). IHS accepted as eligible contract support costs activities that included "training" and "certification" for various treatment professionals. *See* A.R., ECF No. 11-1 at 6. IHS does not explain why training and certifying treatment staff would not be an activity the Secretary would "normally . . . carr[y] on" in operating a treatment center, whereas facility support costs would be. Just as IHS argues that facility support costs are a "normal" cost incurred in operating a treatment program, so too arguably is training and certifying the staff needed to treat patients. There is nothing in the statute that suggests one cost is a "normal" program cost, while the other is not. *See generally* 25 U.S.C. § 5325.

The Court recognizes that facility support costs were provided in the Secretarial amount when the contract was initially executed in 1992, and that at least a portion of facility support costs have been provided annually in the Secretarial amount since then. Pl.'s Stmt., ECF No. 13-2 ¶ 4; Defs.' MSJ, ECF No. 15 at 18. But IHS does not explain why facility support costs are "normally" incurred by an agency in running a treatment program, nor does it elaborate on other

costs that are "normally" incurred by an agency in operating a federal program. *C.f. Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Human Servs.*, 83 F.3d 1497, 1506 (D.C. Cir. 1996) (finding the agency's interpretation of an ambiguous statutory provision inadequate in part because the agency failed to define "normal working conditions" and explain why the protocol it selected was normal). Moreover, and as will be discussed in greater detail, IHS does not sufficiently explain why facility support costs cannot be funded by both types of funding, to the extent the funding is not duplicative.

Indeed, the Court discusses IHS' Indian Health Manual ("Manual")—a document created by IHS to provide guidance regarding eligible contract support costs—in further depth below, but one provision provides further support for the Court's conclusion that the funding provision is ambiguous. In defining direct contract support costs, IHS states that "facility support costs" may be eligible as contract support costs "to the extent not already made available." *See* Indian Health Manual ("IHM") § 6-3.2(D), available at https://www.ihs.gov/ihm/pc/part-6/p6c3/.[7] Since IHS itself

---

[7] IHS includes Part 6, Chapter 3 of the Indian Health Manual as Exhibit 1 to its reply. *See* ECF No. 21-1. However, the version IHS attaches is not the most recent version of the Manual. Throughout this Opinion, the Court cites and refers to the updated version of the Manual located at https://www.ihs.gov/IHM/.

provides guidance that asserts that facility support costs may also be eligible as contract support costs, the Court is persuaded that the ISDEAA funding provision is ambiguous.[8]

The ISDEAA's legislative history also supports this conclusion. In 1994, Congress amended the ISDEAA to "more fully define" contract support costs. S. Rep. No. 103-374, at 8 (1994). Congress clarified that "[i]n the event the Secretarial amount . . . for a particular function proves to be insufficient in light of a contractor's needs for prudent management of the contract, contract support costs are to be available to supplement such sums." *Id.* at 9.

While it may well be *reasonable* to assume that an agency to "normally" incurs facility support costs when operating a treatment center, the Court is not persuaded that Congress has "unambiguously expressed" its intent such that IHS' interpretation is *required* by the statutory language. *Chevron,* 467 U.S. at 843; *see also Air Transp. Ass'n of Am. v. FAA,* 169 F.3d 1, 4 (D.C. Cir. 1999) ("Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable."). It is plain

---

[8] True, the Manual also states that facility costs may be funded as contract support costs in "extremely rare" circumstances. IHM Ex. 6-3-G § C. However, the Manual goes on to clarify that those "extremely rare circumstances" exist "when the awardee did not receive funds" in the Secretarial amount. *Id.* CITC argues just that. *See infra* Sec. IV.C.

that facility support costs may be activities "normally" carried on by IHS but may also be "reasonable costs for activities which must be carried on by a tribal organization as contractor to ensure compliance with the terms of the contract and prudent management," as CITC argues. 25 U.S.C. § 5325(a)(2).

Thus, the Court concludes that the ISDEAA's funding provision is ambiguous: it is "fairly capable of two interpretations," and the tribe's "interpretation is fairly possible." *Chickasaw Nation*, 534 U.S. at 94 (quotations omitted).

### C. CITC's Interpretation is Reasonable in Light of IHS' Guidance

Because the Court finds the provision at issue to be ambiguous, the Court must liberally construe it in CITC's favor. *Blackfeet Tribe,* 471 U.S. at 766. CITC argues that facility support costs are eligible as contract support costs because they are "reasonable costs for activities which must be carried on by a tribal organization as contractor" pursuant to 25 U.S.C. § 5325(a)(2). *See* Pl.'s MSJ, ECF No. 13-1 at 1. As such, IHS "shall" approve the contract proposal and fund the requested facility support costs as a contract support costs. *Id.* at 5 (quoting 25 U.S.C. § 5325(a)(2)). CITC argues that this interpretation is consistent with IHS' Manual. *See id.* at 11-12; Pl.'s Reply, ECF No. 18 at 4-14. IHS also relies on its Manual

to argue that CITC's interpretation is not reasonable because facility support costs are clearly and exclusively included in the Secretarial amount. *See* Defs.' MSJ, ECF No. 15 at 11-12, 17

"Although not the only plausible interpretation, [CITC's] interpretation is a reasonable one." *Maniilaq Ass'n*, 170 F. Supp. 3d at 251. In *Maniilaq Association*, Judge Bates found another provision of the ISDEAA to be ambiguous. *Id.* at 249-51 (analyzing 25 U.S.C. § 5324(l), which entitles tribal contractors to an unexplained amount of compensation for leases, which "may include" "reasonable expenses" associated with the lease). In light of the statute's ambiguous language and IHS' contradictory guidance interpreting such language, Judge Bates found that the tribe's interpretation was reasonable because it found "some support" in IHS' guidance. *Id.* at 251 (construing all ambiguities in favor of the tribe). So here too. While IHS' regulations do not directly address the issue before the Court, IHS' guidance contradicts its interpretation, and CITC's interpretation finds "some support" in the Manual. *Id.*

Because "the ISDEAA does not provide any formula or methodology for calculating [contract support costs]," IHS developed the Manual to "provide[] guidance to both Tribal and Agency personnel in the preparation and negotiation of requests for [contract support costs]." Defs.' MSJ, ECF No. 15 at 11; *see also* IHM § 6-3.1. The Manual is not a regulation and is

therefore not binding on the agency or the tribes, *see* IHM § 6-3.1, but it is cited frequently by IHS as evidence that its interpretation is compelled by the ISDEAA, *see generally* Defs.' MSJ, ECF No. 15. As IHS states, the Manual "provides specific guidance for each category of [contract support costs]" and "provides guidance on whether other specific costs are eligible for [contract support costs] funding." Defs.' MSJ, ECF No. 15 at 12. In fact, the self-determination contract between CITC and IHS incorporates the Manual to the extent it is not inconsistent with the ISDEAA. A.R., ECF No. 11-1 at 21 § (2)(7)(A) (contract support costs shall be "recalculated as necessary to reflect the full [contract support costs] required [under the ISDEAA] . . . as specified in the IHS Manual Part 6, Chapter 3.").

The Manual contemplates that facility support costs may be eligible for contract support costs funding. It defines direct contract support costs as described in the statute, 25 U.S.C. § 5325(a)(2)-(3), and provides "examples" of "direct costs eligible for [contract support costs] funding." IHM § 6-3.2(D)(1)(e). Included in the list of eligible examples is "facility support costs to the extent not already made available." *Id.* The Manual also contemplates that facility support costs can also be "indirect costs" that are eligible for contract support cost funding pursuant to 25 U.S.C. § 5325(a)(2)-(3). IHM Ex. 6-3-G § (A)(2)(C). To illustrate,

pursuant to the Manual "indirect-type costs" "normally" consist of cost categories that fall within the requirements of the contract support costs definitional subsections. *Id.* These indirect-type costs "generally" fall into three categories, one of which is "facilities and equipment." *Id.*

The Manual therefore suggests that facility support costs may be funded as both Secretarial funding *and* contract support costs funding, so long as there are no duplicate payments. For example, in a Manual exhibit describing IHS' "standards for review and approval of contract support costs," IHS elaborates that "rent/utilities" are "generally . . . not included in the [direct contract support costs] requirement." IHM Ex. 6-3-G § C. It clarifies that facility support costs are eligible as contract support costs in "extremely rare circumstances when the awardee did not receive the funds in the Section 5321(a)(1) [Secretarial funding] amount." *Id.* IHS frequently points to this language to support its argument that facility support costs must be included in the Secretarial amount. *See generally* Defs.' MSJ, ECF No. 15. However, the Manual makes clear that facility support costs *may* be funded as contract support costs when they not provided within the Secretarial amount, as CITC argues is the case here. *See* IHM Ex. 6-3-G § C; IHM § 6-3.2(D)(1)(e) ("examples" of "direct costs eligible for [contract support costs] funding" include "facility support costs to the extent

not already made available"). Indeed, in 1994 Congress amended the ISDEAA to make available contract support costs funding for costs not otherwise provided for in the Secretarial amount. *See* S. Rep. No. 103-374, at 9 (1994) ("[i]n the event the Secretarial amount . . . for a particular function proves to be insufficient in light of a contractor's needs for prudent management of the contract, contract support costs are to be available to supplement such sums"). Thus, the Manual does not foreclose the possibility that facility support costs may be funded as contract support costs, albeit in limited circumstances when not otherwise provided.

In sum, the Manual—a document created by IHS to provide instructional guidance regarding an ambiguous statutory provision—separately states that facility support costs can be provided as: (1) "direct" contract support costs funding; (2) "indirect-type" costs normally eligible for contract support costs funding; and (3) "generally" included in the Secretarial amount. *See* IHM §§ 6-3.1, *et. seq.*; IHM Ex. 6-3-G. Given this contradictory guidance, and construing all ambiguities in CITC's favor, CITC's interpretation that facility support costs may also be funded as contract support costs to the extent not already provided is imminently reasonable. *See also Maniilaq Ass'n*, 170 F. Supp. 3d at 251 (concluding that the tribe's

interpretation, which found "some support" in the contradictory regulations, was reasonable).

## D. IHS' Interpretation is Not Compelled by the ISDEAA

IHS argues that its declination decision was compelled by the ISDEAA. First, IHS highlights the Manual language that "rent/utilities" are only eligible as direct contract support costs in "extremely rare circumstances." *See, e.g.*, Defs.' MSJ, ECF No. 15 at 17 (quoting IHM Exhibit 6-3-G). However, the Manual suggests that facility support costs *could* be eligible for contract support costs funding when not otherwise made available in the Secretarial amount. As discussed, "facility support costs" may be eligible for direct contract support costs funding "to the extent not already made available." IHM § 6-3.2(D)(1)(e) (listing examples of direct contract support costs and including facility support costs); *see also* S. Rep. No. 103-374, at 9 (1994) ("[i]n the event the Secretarial amount . . . for a particular function proves to be insufficient in light of a contractor's needs for prudent management of the contract, contract support costs are to be available to supplement such sums"). Furthermore, IHS acknowledges that activities that should be included in the Secretarial amount could nonetheless be eligible for contract support funding "upon a showing that the IHS did not actually transfer any funding to the tribe for the related activity." Defs.' Reply, ECF No. 21 at 10, n.28

(discussing the Manual). CITC argues just that: IHS has not transferred funding for facility support costs beyond the $11,838.50 provided annually since 1992. *See* Pl.'s Reply, ECF No. 18 at 16-18. Thus, the necessary facility support cost funding has not been "made available" and may therefore be eligible as contract support costs funding. *See id.*

Second, IHS repeatedly argues that CITC has already received facility support costs funding in its Secretarial amount, Defs.' MSJ, ECF No. 15 at 4, 5, 7; Defs.' Stmt., ECF No. 15-1 ¶ 8, and that if IHS "pa[id] these costs again as [contract support costs], [IHS] would violate [the ISDEAA provision] that prohibits the payment of [contract support costs] for costs already included in the contractor's program funding," A.R., ECF No. 11-1 at 3. The parties do not dispute that CITC was funded $11,838.50 in 1992 for facility support costs, and that the funding was included in the Secretarial amount. Pl.'s Stmt., ECF No. 13-2 ¶ 4; Defs.' MSJ, ECF No. 15 at 18. IHS contends that facility support costs funding has since increased and has been accounted for in CITC's Secretarial amount. Defs.' MSJ, ECF No. 15 at 16-18. IHS fails, however, to cite to any evidence in the record or to otherwise support this assertion. *See generally id.*; Defs.' Stmt., ECF No. 15-1. Indeed, the Court reviewed the hundreds of pages of administrative record and could not locate *any* documentation supporting IHS' claim that funding for

facility support costs within the Secretarial amount has increased. *See generally* A.R., ECF Nos. 11, 17, 20; IHS Answer, ECF No. 7 ¶ 19 (IHS "has no knowledge of how much of [the lump sum funding amount] Plaintiff spends for facility costs").

IHS posits that it is "irrelevant" that it cannot show how much facility funding has been provided to CITC beyond the $11,838.50 provided annually since 1992. Defs.' Reply, ECF No. 21 at 15. The Court disagrees. As discussed at length *supra*, the Manual provides that facility support costs may be eligible for contract support costs funding *to the extent they are not provided in the Secretarial amount*. IHM § 6-3.2(D)(1)(e). Accordingly, IHS has not met its burden to establish that facility support costs beyond the $11,838.50 were provided in CITC's Secretarial amount. In fact, the only support that IHS cites in its "Statement of Material Facts Not in Dispute" is CITC's complaint and its own July 7, 2014 letter declining CITC's proposed contract amendment. *See* Defs.' Stmt., ECF No. 15-1 ¶ 8 (citing Compl., ECF No. 1 ¶¶ 2, 28, 33); *see id.* ¶ 13 (citing "Exhibit 3[9] (July 7, 2014 Declination Letter)"). Neither the complaint nor the declination letter establishes that CITC's

_____

[9] IHS did not attach an "Exhibit 3" to its motion for summary judgment. *See* ECF No. 15. Fortunately, the Court was able to review the July 7, 2014 declination letter—cited as "Exhibit 3" in IHS' statement of undisputed facts—because it was included in the administrative record. *See* A.R., ECF No. 11-1 at 2-3.

increased facility support costs were provided in the Secretarial amount.

Third, IHS argues that because facility support costs were originally included in CITC's Secretarial amount, these costs must always be included in that amount. Essentially, IHS contends that the ISDEAA clearly mandates that activities may only be funded by one type of funding. *See* Defs.' Stmt., ECF No. 15-1 ¶ 8; Defs.' MSJ, ECF No. 15 at 18; *see also* Defs.' Reply, ECF No. 21 at 6, 17. The Court disagrees. The statute, IHS' regulations, and the Manual suggest that activities can be funded both in the Secretarial amount and as contract support costs, so long as the funds are not duplicative. *See generally* 25 U.S.C. § 5325(a).

To illustrate, to "clarify[]" eligible contract support costs, the Manual includes guidelines for calculating direct contract support costs. IHM Ex. 6-3-G. To compute the amount required, "the awardee and the IHS must negotiate the total cost . . . of the activities to be supported with [contract support cost funding]. After . . . , the Agency will deduct any funds that may have been provided to the awardee in the Secretarial amount for this activity to avoid the duplication of costs." *Id.* § C. Thus, the Manual contemplates that certain activities may be funded via *both* types of funding, so long as the payments are not duplicative. *See id.* Indeed, IHS acknowledges that at least

33

one activity is funded by both Secretarial funding and contract support costs funding. *See* Defs.' Reply, ECF No. 21 at 10-11. According to IHS, "fringe benefits" are "treated differently" than other types of activities because they are funded as both Secretarial costs and contract support costs. *See id.; see also* IHM Ex. 6-3-G § C ("Fringe benefits have historically constituted . . . [direct contract support costs]. The Agency reviews the documented [fringe benefits] amounts requested by the awardee and deducts the amount provided as part of the [Secretarial] amount to the awardee.").

IHS regulations also contradict IHS' third argument. While the regulations do not interpret the funding provision at issue, they do provide that some activities may be funded from multiple sources. For example, a tribe is entitled to compensation and costs related to leases under the ISDEAA. *See* 25 U.S.C. § 5324(l). IHS regulations state that the "same types of costs" associated with leases "may be recovered in whole or in part" in the tribe's Secretarial amount *or* as lease compensation pursuant to section 5324(l). *See* 25 C.F.R. § 900.73 (referring to 25 C.F.R. § 900.70 and 25 U.S.C. § 5325(a)(1)); *see also Maniilaq Ass'n*, 170 F. Supp. 3d at 252 ("[the regulation] appears to designate section 105(l) leases and [secretarial] funding as equivalent methods of tribal cost recovery."). Not unlike the Manual's guidance, IHS' regulations undermine its argument that

activities are funded exclusively in one category. *See* Defs.'
Reply, ECF No. 21 at 2-3.

Indeed, the ISDEAA provision prohibiting duplicate funding
is necessary only because activities may be funded in *both* the
Secretarial amount and as contract support costs. *See* 25 U.S.C.
§ 5325(a)(3)(A). If there was no overlap between the two funding
provisions, as IHS contends, this section of the statute would
be superfluous. *See United States v. Jicarilla Apache
Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in
the past, we are hesitant to adopt an interpretation of a
congressional enactment which renders superfluous another
portion of that same law") (quotations omitted). And there would
be no need to "deduct any funds" from the contract support costs
funding that "may have been provided . . . in the [S]ecretarial
amount" because *any* activity included in the Secretarial amount
would be categorically disqualified from contract support costs
funding. *See* IHM Ex. 6-3-G § C.

Ultimately, IHS' conclusion that *all* facility support costs
must be funded in the Secretarial amount because some have been
since 1992 is not "compelled by the statute and the regulations"
or even IHS' own guidance. *Maniilaq Ass'n*, 170 F. Supp. 3d at
252-54 (concluding that the HHS Secretary's interpretation of
the ISDEAA was not compelled by the statute and regulations
after determining that the statute was vague and the tribe's

interpretation was reasonable). As in *Maniilaq Association*, "[t]hese questions pose serious problems for the Secretary's interpretation, which the Secretary has not adequately addressed." *Id.* at 254.

**E. Remand is the Appropriate Remedy**

The Court finds that IHS' declination decision was not clearly required by the ISDEAA, as non-duplicative facility support costs may reasonably be funded as contract support costs. Thus, IHS has not clearly demonstrated that the funds requested are "in excess of the applicable funding level for the contract." *See* A.R., ECF No. 11-1 at 2-3 (Declination Letter). Mindful of the government's obligation to "clearly demonstrate" the declination criteria, 25 U.S.C. § 5321(a)(2), and the Court's obligation to construe the ISDEAA "liberally in favor of" CITC, *Chickasaw Nation*, 534 U.S. at 93, the Court hereby grants in part CITC's motion for summary judgment and denies the defendants' cross-motion for summary judgment.

That leaves only the issue of remedy. Unlike Secretarial funding—which is committed to the agency's discretion, *see* 25 U.S.C. § 5325(a)(1)("the amount of funds provided . . . shall not be less than the appropriate Secretary would have otherwise provided")—contract support funding is not, *see id.* § 5325(a)(2). As such, the "government cannot back out of its contractual promise to pay each Tribe's full contract support

costs." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012); *Ramah Navajo Sch. Bd. v. Babbitt,* 87 F.3d 1338, 1344 (D.C. Cir. 1996)("Congress has clearly expressed in the [ISDEAA] both its intent to circumscribe as tightly as possible the discretion of the Secretary . . . . Congress left the Secretary with as little discretion as feasible in the allocation of [contract support funds].")(citations omitted).

CITC asks the Court to reverse IHS' declination decision, declare that CITC's contract amendment proposal is approved, and order immediate injunctive relief by awarding an additional $467,201.50[10] in contract support costs funding to CITC's 2014 contract. Pl.'s MSJ, ECF No. 13-1 at 20.

The Court will vacate the Secretary's declination decision but stop short of granting the other specific relief that CITC requests. The ISDEAA authorizes the Court to "order appropriate relief including money damages, injunctive relief . . . , or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty . . . (including . . . to compel the Secretary to award and fund an approved self-determination contract)." 25 U.S.C. § 5331(a). Here, however, the record does not contain sufficient documentation to support

---

[10] This amount reflects the $479,040 CITC requests for facility support costs less the $11,838.50 it has been awarded annually since 1992. *See* Pl.'s MSJ, ECF No. 13-1 at 20.

CITC's full request. *See generally* A.R., ECF Nos. 11, 17, 20.
For example, the Court cannot assure itself that the $467,201.50
requested reflects the "reasonable and allowable costs" for
facility support costs funding pursuant to 25 U.S.C. §
5325(a)(2),(3). Moreover, because the administrative record does
not contain any information regarding the facility support costs
paid via the Secretarial amount, the Court cannot assure itself
that CITC's request does not duplicate any funding already
provided. *See* A.R., ECF Nos. 11-1, 17, 20; 25 U.S.C. §
5325(a)(3)(A).

Therefore, the Court will remand CITC's contract proposal
to IHS for a decision consistent with this Memorandum Opinion.
*See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 ("the
proper course . . . is to remand to the agency for additional
investigation" when "the record before the agency does not
support the agency action, if the agency has not considered all
relevant factors, or if the reviewing court simply cannot
evaluate the challenged action on the basis of the record before
it"). As the record stands now, there is insufficient
information for the Court to determine the amount CITC is owed
for facility support costs. As this Opinion makes clear,
however, CITC's contract amendment proposal was improperly
declined. Therefore, on remand, IHS must review CITC's proposal
in a manner consistent with this Memorandum Opinion and

determine the amount of facility support costs that should be funded as contract support costs beginning with the 2014 contract to date.

## V. Conclusion

For the reasons set forth above, the Court **GRANTS IN PART** CITC's motion for summary judgment and **DENIES** defendants' cross-motion for summary judgment. IHS' declination decision is **VACATED**. CITC's contract amendment proposal is **REMANDED** to IHS for a determination consistent with this Memorandum Opinion regarding the amount of facility support costs that should be funded as contract support costs, beginning with the 2014 contract to present. The Clerk of Court is directed to close this case, with such closure being without prejudice to a motion to re-open following further IHS proceedings. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**            United States District Judge**
**            November 7, 2018**